*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *DAVID O. WARNER, et al.,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *Docket No. 04-123-P-S* |
| | ) | |
| *ATKINSON FREIGHT LINES CORP.,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT*

Both the plaintiffs and the defendant seek summary judgment in this action brought under 26 M.R.S.A. § 621-A *et seq.* that was removed by the defendant from the Maine Superior Court (Cumberland County). I recommend that the court deny the plaintiffs' motion and grant the defendant's motion in part.

## I. Summary Judgment Standard

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc*., 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id*. (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co*., 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.* Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

**B. Local Rule 56**

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(e). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations

to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted." (citations and internal punctuation omitted).

## II.  Factual Background

The following undisputed material facts are appropriately supported in the parties' respective statements of material facts.[1]

The defendant, Atkinson Freight Lines Corporation ("AFL"), is a trucking company with headquarters in Bensalem, Pennsylvania.  Defendant Atkinson Freight Lines Corp.'s Statement of Material Facts in Support of its Motion for Summary Judgment ("Defendant's SMF") (Docket No. 23) ¶ 1; Plaintiffs' Opposing Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Responsive SMF") (Docket No. 31) ¶ 1.  AFL operates primarily in the northeastern United States.  *Id.*  It operates two trucking terminals, one in Bensalem, Pennsylvania, and one in Scarborough, Maine.  *Id.* ¶ 2.  Its truck drivers were members of the International Brotherhood of Teamsters (the "union").  *Id.* ¶ 3.

AFL employed plaintiff David O. Warner as a truck driver between April 20, 1999 and July 5, 2002.  *Id.* ¶ 4.  It employed plaintiff William D. Freeman as a truck driver between March 13, 2000 and July 10, 2002.  *Id.* ¶ 5.  It employed plaintiff Daniel S. McLaughlin as a truck driver between November 26, 1990 and August 26, 2002.  *Id.* ¶ 6.  It employed plaintiff Roger L. Lehouillier as a truck driver between September 5, 2000 and March 6, 2003.  *Id.* ¶ 7.  Warner, Freeman and McLaughlin voluntarily terminated their employment with AFL.  *Id.* ¶ 8.  Lehouillier was laid off when AFL closed its Scarborough, Maine terminal.  *Id.*

---

[1] The plaintiffs have filed a purported "reply" to the defendant's response to the statement of material facts submitted by the plaintiffs in support of their motion for summary judgment.  Plaintiffs' Reply Statement of Material Facts in Support of Their Motion for Summary Judgment and in Reply to the Defendants' Opposition Thereto (Docket No. 36).  No such "reply" is contemplated or permitted by Local Rule 56.  The plaintiffs did not seek leave to file such a document.  It is therefore stricken from the record of this case.

Throughout their employment by AFL, the plaintiffs were members of Teamsters Union Local 340. *Id.* ¶ 10. All AFL drivers who were based in its Scarborough, Maine terminal were members of Local 340. *Id.* ¶ 11. All AFL drivers based in the Pennsylvania terminal were members of Teamsters Union Local 312. *Id.* Throughout the employment of each plaintiff, AFL also had non-union employees, including management, officer workers and dispatchers. *Id.* ¶ 12. Throughout the employment of each plaintiff by AFL, William Turkewitz worked as the business agent for Local 340. *Id.* ¶ 13. During the same period, Theodore Uniatowski worked as the business agent for Local 312. *Id.* ¶ 14.

Local 340 acted as the plaintiffs' sole and exclusive bargaining agent in all negotiations with AFL regarding employee wages and benefits. *Id.* ¶ 15. As the business agent of Local 340, Turkewitz helped organize, represent, negotiate for and provide information to members concerning contracts and benefits. *Id.* ¶ 16. The truck driver employees of AFL in Maine, including plaintiffs, constituted a "unit," which Turkewitz represented. *Id.* ¶ 17.

Turkewitz, Uniatowski and the shop stewards for Locals 340 and 312 negotiated the terms of a collective bargaining agreement between AFL and Locals 340 and 312 which was effective between July 20, 1999 and October 31, 2004 (the "1999 CBA"). *Id.* ¶ 20. The terms and conditions of this collective bargaining agreement were approved and ratified by a majority vote of the members of Locals 340 and 312. *Id.* ¶ 21.

In or around April 2000, the owner of AFL, Joseph B. Atkinson, Jr., proposed creating an employee stock ownership plan ("ESOP") to enable AFL's employees to obtain a majority equity stake in AFL. *Id.* ¶ 24. The plan was to accomplish the transfer of ownership of AFL to employees through the ESOP. Plaintiffs' Statement of Material Facts Not in Dispute ("Plaintiffs' SMF") (Docket No. 28) ¶ 23; Defendant Atkinson Freight Lines Corp.'s Opposing Statement of Material Facts, etc.

("Defendant's Responsive SMF") (Docket No. 33) ¶ 23.   Over the next several months, representatives of AFL, the union and third-party consultants engaged in negotiations and planning concerning formation of the proposed ESOP.   Defendant's SMF ¶ 25; Plaintiffs' Responsive SMF ¶ 25.   The Buy-Out Steering Committee, made up of a cross-section of union and non-union, managerial and non-managerial employees, retained the consultants, who were paid by AFL. Plaintiffs' SMF ¶ 25; Defendant's Responsive SMF ¶ 25. The results of that negotiation and planning were presented in a memorandum dated August 9, 2000 prepared by Ownership Associates, Inc. and Kokkinis & Associates, Inc., which was provided to all AFL employees (the "August memorandum"). Defendant's SMF ¶ 26; Plaintiffs' Responsive SMF ¶ 26.   The ESOP proposed by the memorandum was to be non-contributory and non-discretionary;  AFL would provide the money to finance the ESOP and participants would have no discretion as to whether they would be covered by or participate in the ESOP.   *Id*. ¶¶ 27-28.   AFL and its employees agreed that the ESOP shares of AFL were to be purchased with money held in an "ESOP Trust," a fund created from money equaling 4% of all employees' wages.   Plaintiffs' SMF ¶ 28; Defendant's Responsive SMF ¶ 28.

Under the proposed ESOP, the ESOP Trust, on behalf of all AFL employees, would purchase 67% of AFL's stock for approximately $2.7 million, which would be financed by a note payable to Joseph B. Atkinson, Jr. over 15 years at 9.5% interest (the "note").   Defendant's SMF ¶ 29; Plaintiffs' Responsive SMF ¶ 29.   Payments by the ESOP under the note were expected to be approximately $331,000 per year.   *Id*. ¶ 30.   As of August 2000, it was projected that if AFL were able to reduce its total employee payroll expense by 4 %, it would be able to save approximately $329,000 per year. *Id*. ¶ 32.   Formation and funding of the ESOP in accordance with the August memorandum required union approval and a modification of the 1999 CBA.   *Id*. ¶ 33.   Turkewitz, Uniatowski and the shop stewards for Locals 340 and 312 negotiated the terms of a collective bargaining agreement between

AFL and Locals 312 and 340 as extended to October 31, 2005 (the "2000 CBA"). *Id*. ¶ 34. Under the terms of the 2000 CBA, AFL's drivers' wages were reduced by 4% from the wage rates provided in the 1999 CBA. *Id*. ¶ 36.

In his capacity as trustee and business agent for Local 340, Turkewitz issued a memorandum dated August 10, 2000 to all members of Local 340 employed by AFL with which was enclosed material relating to the proposed ESOP and which advised that Locals 340 and 312 had been in negotiations with AFL concerning issues relating to the ESOP and the 1999 CBA and announcing an August 19, 2000 meeting to explain the transaction and to conduct a secret ballot to approve the modification of the 1999 CBA. *Id*. ¶ 38. On August 19, 2000 the membership of Locals 340 and 312 voted to ratify and approve the terms and conditions of the 2000 CBA. *Id*. ¶ 39. Warner, McLaughlin and Freeman participated in the vote; Lehouillier did not because he was not yet an employee of AFL or a member of Local 340. *Id*. 39-40. Beginning on August 20, 2000 the wages of all current AFL employees were reduced by 4 %. *Id*. ¶ 42. All employees were told in writing that their "4% wage adjustment" contributions were being put aside "in escrow" fur the purchase of AFL stock. Plaintiffs' SMF ¶ 44; Defendant's Responsive SMF ¶ 44.

Less than two weeks after the union voted to approve the 2000 CBA, Joseph B. Atkinson, Jr. died. Defendant's SMF ¶ 44; Plaintiffs' Responsive SMF ¶ 44. This death created legal issues that were never contemplated by the parties prior to the August 19, 2000 union vote and which caused significant delay in the implementation of the proposed ESOP. *Id*. ¶ 45.

On the first pay period following ratification of the 2000 CBA, AFL began segregating approximately $28,000 per month into a separate company interest-bearing account to be used to fund the proposed ESOP. *Id*. ¶¶ 46, 49. Initially, the monthly deposit into this account represented the approximate amount of the projected monthly debt service for the proposed note. *Id*. ¶ 47. Thereafter,

AFL changed the monthly deposit into this account to an amount equal to 4 % of the wages of current employees who were employed as of August 19, 2000.  *Id*. ¶ 48.  Throughout their employment by AFL, each plaintiff was paid the full amount of wages due under the terms of the collective bargaining agreement then in force between AFL and the union.  *Id*. ¶ 51.

Starting in September 2000, AFL began to refer to itself as "an employee-owned company." Plaintiffs' SMF ¶ 41; Defendant's Responsive SMF ¶ 41.  In a letter dated March 26, 2001 CEO Joseph B. Atkinson, III, stated to all employees that "AFL employees have accumulated Two Hundred Thousand Dollars in a dedicated escrow account that is growing by an average of Twenty Eight Thousand Dollars per month."  *Id*. ¶ 45.  AFL consistently referred to these funds as "escrowed" money.  *Id*. ¶ 46.  By early 2003, AFL was experiencing financial difficulties caused by significant changes in economic conditions.  Defendant's SMF ¶¶ 53-54; Plaintiffs' Responsive SMF ¶¶ 53-54. As a result, AFL requested that the parties invoke the emergency reopener provisions of the 2000 CBA.  *Id*. ¶ 55.  AFL closed its Scarborough terminal on or about March 8, 2003.  *Id*. ¶ 56. Throughout the winter and spring of 2003, AFL and representatives of the union engaged in collective bargaining negotiations concerning proposed amendments to the 2000 CBA, including unwinding the parties' agreement to create the ESOP, the employees' health insurance contributions and wages.  *Id*. ¶ 57.

The ESOP was never established as a legal plan; AFL was never employee-owned.  Plaintiffs' SMF ¶ 49; Defendant's Responsive SMF  ¶ 49.

AFL contends that it made the union representative and its employees aware that it proposed that the amount of payment to employees  who had been employed on August 19, 2000 from the company  ESOP account would be equal to 4% of the wages they would have earned from August 20, 2000 through December 31, 2002.  Defendant's SMF ¶¶ 58-60; Plaintiffs' Responsive SMF ¶¶ 58-60.

8

AFL advised Turkewitz in a letter sent by fax on May 29, 2003 that only Local 340 employees who "qualified" would receive a payout from the ESOP account. *Id*. ¶ 64. Later that day AFL faxed to Turkewitz a list of the Local 340 employees that AFL had determined would "qualify" for a payout from the ESOP account. *Id.* ¶ 65. The employees whose names appear on this list are those Local 340 employees who were employed from August 19, 2000 through December 31, 2002. *Id*. ¶ 66. None of the plaintiffs' names appears on this list. *Id.* ¶ 68.

On June 29, 2003 Locals 340 and 312 held separate meetings to vote on the proposed amendments to the terms and conditions of the 2000 CBA. *Id*. ¶ 69. At the Local 340 meeting, Turkewitz read aloud the names appearing on the list that had been faxed to him by AFL and explained that these were the individuals who would receive a payment from the ESOP account. *Id*. ¶ 70. The union members' ratification vote was to be determined by a majority of votes cast. *Id*. ¶ 72. Freeman was present at the Local 340 meeting. *Id*. ¶ 73. Both locals voted to approve the changes. *Id*. ¶¶ 75-76.

On the next pay day following the June 2003 meetings, AFL made a payment to all employees who had been employed from August 19, 2000 through December 31, 2002 in an amount equal to 4% of the wages they would have earned from August 20, 2000 through December 31, 2002 under the wage rates in effect on August 19, 2000. *Id*. ¶ 78. The total funds set aside in the ESOP account by AFL was not sufficient to cover the total of the payments made by AFL to qualified employees and lawyers and consultants who had been retained to provide services in connection with the proposed ESOP. *Id*. ¶ 79. AFL used other operating revenue to complete these payments. *Id*. Warner, Freeman and McLaughlin were employed by AFL on August 19, 2000 but terminated their employment with AFL before December 31, 2002. *Id*. ¶ 80. Lehouillier was not employed by AFL on August 19, 2000. *Id*. ¶ 81. Three individuals who were not employed by AFL on June 29, 2003 received a

payment from the ESOP account because they had been employed by AFL from August 19, 2000 through December 31, 2002. *Id.* ¶ 82.

After the return of the ESOP funds to other AFL employees, Turkewitz and the plaintiffs' attorney demanded that AFL return the 4% of their wages withheld from each plaintiff, but AFL refused. Plaintiffs' SMF ¶ 76; Defendant's Responsive SMF ¶ 76.[2] Each of the plaintiffs filed unfair labor practice charges against AFL with the National Labor Relations Board ("NLRB") on or about December 19, 2003. Defendant's SMF ¶ 83; Plaintiffs' Responsive SMF ¶ 83. They later voluntarily withdrew these charges. *Id.* ¶ 86.

### III. Discussion

The complaint alleges conversion, breach of fiduciary duties and violation of 26 M.R.S.A. § 626-A and seeks an equitable accounting. Complaint ¶¶ 14-35.[3]

### A. Preemption

The defendant contends that 29 U.S.C. § 185, often referred to as section 301 of the Labor-Management Relations Act, preempts all of the remaining claims asserted in the complaint. Defendant Atkinson Freight Lines Corp.'s Motion for Summary Judgment, etc. ("Defendant's Motion") (Docket No. 22) at 13-21. The defendant raised this issue in its motion to dismiss, which was addressed in detail by Judge Singal last November. Judge Singal denied that motion, but noted that "[t]he Court may yet determine that section 301 preempts Plaintiffs' claims." November Order at 23. Judge Singal held only that

> it may turn out that Plaintiffs are able to prove facts that entitle them to relief
> since there is nothing in their claims or in the CBA itself establishing that

---

[2] The defendant's response to this paragraph of the plaintiffs' statement of material facts begins with the word "Denied," but it admits "that the stated demands were made" and does not deny that it refused them. Defendant's Responsive SMF ¶ 76. The paragraph is accordingly deemed admitted to the extent that it provides the basis for this sentence of the recommended decision.

[3] Count V of the complaint has been dismissed. Order on Plaintiffs' Motion to Remand and Defendant's Motion to Dismiss ("November Order") (Docket No. 14) at 28.

their claims depend upon the meaning of a collective bargaining agreement and are therefore preempted.

*Id.* Judge Singal's analysis of preemption under section 301, which follows, will also inform my consideration of the pending motion:

> Section 301 of the LMRA empowers federal courts to hear disputes between unions and employers over contract violations.[4] While seemingly modest in scope, the Supreme Court has interpreted this provision as "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers Corp*. [*v. Lueck*], 471 U.S. [202,] 209 [(1985)].
>
> Preemption of state laws that threaten to interfere with federal regulation of labor relations is a key aspect of the Supreme Court's section 301 jurisprudence. "Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Allis-Chalmers Corp*., 471 U.S. at 209–10. Uniform federal rules governing the interpretation of CBAs are necessary because "the possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Teamsters v. Lucas Flour Co*., 369 U.S. 95, 103 (1962). Hence, the Supreme Court has found that state law is preempted both in actions to enforce collective bargaining agreements, *see id*., and in any actions that "require construing the collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc*., 486 U.S. 399, 407 (1988).
>
> Section 301 is perhaps the paradigmatic example of complete preemption. *See Caterpillar* [*, Inc. v. Williams*], 482 U.S. [386,] 393 [(1987)] ("The complete pre-emption corollary to the well-pleaded complaint rule is applied primarily in cases raising claims pre-empted by section 301 of the LMRA."). Since "the pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and labor organization," *Franchise Tax Bd*. [*v. Construction Laborers Vacation Trust*], 463 U.S. [1,] 23 [(1983)], a plaintiff's claim is construed as federal in nature if its resolution "depends upon the meaning of a collective-bargaining agreement" or "requires construing the collective-bargaining agreement." *Lingle*, 486 U.S. at 405–407.

---

[4] Section 301 states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185.

Following *Lingle*'s holding the First Circuit has identified two specific categories of claims that can be said to depend on interpretation of CBAs. *See Flibotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir. 1997). First, claims that allege conduct "that arguably constitutes a breach of a duty that arises pursuant to a collective bargaining agreement" are preempted. *Id.* (citing *United Steelworkers v. Rawson*, 495 U.S. 362, 369 (1990)). Thus, if the duty allegedly breached by the defendant is "without existence independent of the agreement," the plaintiff's claim depends on the meaning of the CBA and is preempted. *Rawson*, 495 U.S. at 369. Second, claims are preempted if their "resolution arguably hinges upon an interpretation of the collective bargaining agreement." *Flibotte*, 131 F.3d at 26 (citing *Allis-Chalmers Corp.*, 471 U.S. at 220). The First Circuit also noted, however, that "purely factual questions about an employee's conduct or an employer's conduct and motives" do not depend upon the meaning of the CBA for preemption purposes. *Id.* (quoting *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 262 (1994)). Nor does section 301 extend to "nonnegotiable rights conferred on individual employees as a matter of state law." *Id.* (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994)).

Although there is much case law on the scope of section 301 preemption, the Supreme Court has noted that "the full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis." *Allis-Chalmers Corp.*, 471 U.S. at 220. In applying section 301, courts have found a wide variety of state law claims to be preempted when the CBA is potentially central to the resolution of the claim,[5] while often refusing to find preemption in cases where the CBA plays only a minor role.[6]

---

[5] *See, e.g., Fant v. New England Power,* 239 F.3d 8, 16 (1st Cir. 2001) (holding that a claim by an injured employee for disability discrimination due to his employer's alleged refusal to rehire him was preempted because the CBA set forth the procedure for laying off and rehiring workers); *Flibotte*, 131 F.3d at 28 (holding that plaintiff's claims for wrongful discharge and related torts were preempted because his discharge was based on his refusal to submit to a drug test, an obligation set forth in the CBA); *Martin v. Shaw's Supermarkets*, 105 F.3d 40, 42–43 (1st Cir. 1997) (finding plaintiff's claims under a Massachusetts law requiring his former company to reinstate him with seniority rights after recovering from an injury to be preempted because the law in question by its own terms was applicable only if it did not conflict with the terms of a CBA); *Quesnel v. Prudential Ins. Co.*, 66 F.3d 8, 11 (1st Cir. 1995) (finding that an employee's claim that he was discharged by his employer for the purpose of denying him his earned sales commissions was preempted because the CBA set forth grievance procedures for wrongful termination).

[6] *See, e.g., Livadas*, 512 U.S. at 125 (holding that section 301 did not preempt a California law imposing liability for untimely payment of an employee's wages since the CBA was only relevant for the purpose of computing damages);*Lingle*, 486 U.S. at 407 (finding that a plaintiff's claim under a Massachusetts law prohibiting employers from discharging employees in retaliation for filing a worker's compensation claim did not raise a preemption issue because the inquiry into an employer's motives for the discharge was purely factual in nature); *In re Carleton Woolen Mills, Inc.*, 281 B.R. 409, 411 (D. Me. 2002) (finding that Maine's Severance Pay Statute, which requires employers to make a one-time severance payment to laid-off employees, was a non-negotiable minimum labor standard that could not be waived by a CBA and therefore was not preempted even when the laid-off employees were subject to a CBA); *Rand v. BIW Corp.*, 2001 U.S. Dist. LEXIS 23164, *16–*17 (D. Me. Feb. 15, 2001) (finding that plaintiffs' breach of contract and fraudulent misrepresentation claims against their employer for assuring them of long-term employment only to lay them off after four months was not preempted under section 301 because there was no disagreement between the parties that CBA permitted the employer to lay off the employees at will).

November Order at 8-10.

Further:

> The first prong of *Flibotte* requires a finding of preemption if it can be shown that the duty allegedly breached by the defendants arose under the collective bargaining agreement. This test is primarily aimed at plaintiffs seeking to recharacterize a claim for breaching the CBA as a tort claim. In *United Steelworkers of America v. Rawson*, 495 U.S. 362 (1990), the case cited by the *Flibotte* court in support of this prong, a union was sued in tort for negligently performing safety inspections. Although the union was obligated to participate in these inspections pursuant to its CBA, the Idaho Supreme Court found that the negligence claim against them was not preempted because once it undertook the inspection, it was obligated to perform the inspection using reasonable care. The Supreme Court reversed, finding that the scope of the union's duty was governed by the CBA since plaintiffs were not alleging that the union breached "a duty of reasonable care owed to every person in society." 495 U.S. at 371.
>
> * * *
>
> [W]hile AFL's alleged failure to pay wages due is undoubtedly at the heart of Plaintiffs' claim under the Maine Wage Statutes, the mere fact that the CBA establishes wage rates does not preempt all cases involving payment of wages under these statutes. Defendant must make some showing that the duties established in the CBA are going to be contested in the case. If both parties agree that the employer had the duty to pay employees at the rates set forth in Article 11, the claim can hardly be said to "depend on the meaning of" Article 11. *See Rand v. BIW Corp.*, 2001 U.S. Dist. LEXIS 23164, *16 (D. Me. Feb. 15, 2001) (finding that a claim does not depend on the meaning of a CBA where there is "no real disagreement" between the parties over the meaning of a term).
>
> * * *
>
> Neither is it clear at this stage that the second prong of *Flibotte* — requiring preemption if the dispute requires the interpretation of the collective bargaining agreement — is implicated by Plaintiffs' claim. Although it may well be that Defendant's duty with regard to the withheld wages, if any exists, is defined by some sort of bargained agreement between the Union and AFL, Plaintiffs' Complaint does not state that this is the case. Plaintiffs' Complaint mentions the CBA only in passing — to note that it called for the ESOP's creation. Although this fact might invite preemption had Plaintiffs sued AFL for failing to create the ESOP, it has little relevance to the question of whether AFL must return Plaintiffs' wages. The only other term of the CBA that addresses the ESOP is the provision in Article 20, which removes disputes about the ESOP from the CBA's grievance procedure. Although AFL asserts that the Court will have to interpret this provision to resolve Plaintiffs' claims, Plaintiffs aver that the ESOP was

13

> never created.  Thus, unless . . . AFL can demonstrate that this dispute is over
> an ESOP that actually existed rather than AFL's unrealized plans to create an
> ESOP, the provision in Article 20 regarding the ESOP would seem to be
> irrelevant to Plaintiffs' claims.

*Id*. at 18, 20-21.

The defendant contends that the resolution of the plaintiffs' claims "depends upon the meaning of the 2000 collective bargaining agreement and/or the Reopener Agreement in both of the ways identified by the First Circuit in *Flibotte*."  Defendant's Motion at 16 (internal quotation marks omitted).  It asserts that the first prong of *Flibotte* is implicated because its "obligation to pay wages and provide benefits to Union workers, including Plaintiffs, can arise only under and through an agreement with the Union."  *Id*.  However, Judge Singal has already ruled that, if the parties agree that the employer had the duty to pay employees at the rates set forth in Article 11 of the collective bargaining agreement, the claim can hardly be said to "depend on the meaning of" Article 11, and the first prong of *Flibotte* would not be implicated.  November Order at 20.  The parties do so agree, Plaintiffs' SMF ¶¶ 12, 36-38, 63, Defendant's Responsive SMF ¶¶ 12, 36-38, 63;  Defendant's SMF ¶¶ 36-37, 69-72, Plaintiffs' Responsive SMF ¶¶ 36-37,  69-72.  Thus, this argument appears to have been foreclosed by Judge Singal's earlier ruling; the defendant's argument adds nothing new to the factual circumstances.  *See also Livadas*, 512 U.S. at 125 (need to refer to collective bargaining agreement to determined bargained-for rates does not implicate § 301 preemption).

The defendant  also contends that the second prong of *Flibotte* is implicated in this case "because it will be necessary for the Court to resort to examination of one or more agreements between AFL and the Union in order to resolve Plaintiffs' claims."  Defendant's Motion at 17.  This is so, it asserts, because the question of what wages were owed requires comparison of the 1999 and 2000 collective bargaining agreements and because the reopener agreement shows that the union agreed to accept the terms of payout of the collected ESOP wages that were offered by the defendant.

*Id*. at 17-18.  Judge Singal's ruling on the motion to dismiss established that the second prong of *Flibotte* might be applicable to this case only if it could be established that the ESOP mentioned in the collective bargaining agreement was actually established.  November Order at 21.  Comparison of the 1999 and 2000 collective bargaining agreements to show the amount of wages that were owed the plaintiffs or any other union members will not require any interpretation of either agreement.  That exercise, as Judge Singal has indicated, cannot provide the basis for section 301 preemption.  The only issue raised by the defendant with respect to the second prong of *Flibotte* that has not been foreclosed by the ruling on the motion to dismiss, as the defendant presents its argument, is that interpretation of the reopener agreement will be necessary.

No document identified as the "reopener agreement" has been submitted to the court.  Indeed, the defendant's statement of material facts suggests that the "agreement" was only an oral one.[7]  Defendant's SMF ¶¶ 57-65, 71.  The substance of what the defendant calls the "reopener agreement" is very much disputed by the parties.  Plaintiffs' Responsive SMF ¶¶ 57-65, 71.  The evidence cited by the defendant and the plaintiffs in support of their respective positions supports those positions.  It is therefore impossible for this court to decide in the context of a motion for summary judgment whether an agreement was reached between the defendant and the union as to who would be repaid the 4 per cent of wages that had been withheld or saved in connection with the proposed ESOP.  The defendant's motion for summary judgment on the basis of preemption by section 301 should be denied.

The preemption argument also provides most of the defendant's opposition to the plaintiffs' motion for summary judgment.  Defendant Atkinson Freight Lines Corp.'s Memorandum of Law in

---

[7] The parties to a collective bargaining agreement may negotiate over and have a binding understanding about an issue that is not part of the collective bargaining agreement but is nonetheless binding.  *See, e.g., Arcadi v. Nestle Food Corp.*, 38 F.3d 672, 675 (2d Cir. 1994); *Chicago & N. W. Transp. Co. v .Railway Labor Executives' Ass'n*, 908 F.2d 144, 156 (7th Cir. 1990); *International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers — Local 1603 v. Transue & Williams Corp.*, 879 F.2d 1388, 1392 (6th Cir. 1989).  In this case, the written collective bargaining agreements do not prohibit amendment or extension by (*continued on next page*)

Opposition to Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Opposition") (Docket No. 32) at 8-13.

## B.  State-Law Issues

The defendant contends, in the alternative, that it is entitled to summary judgment on the merits of the claims stated in the complaint, if those claims are not preempted.  Defendant's Motion at 21-22.  The plaintiffs, who take the position that their claims are not preempted, offer a somewhat more developed argument in favor of their motion for summary judgment on their stated claims.  Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Plaintiffs' Motion") (Docket No. 21) at 9-15.  I reach  these claims on the merits in light of my conclusion that the defendant is not entitled to summary judgment based on preemption on the cognizable record before the court.

The first claim in the complaint seeks an equitable accounting, Compliant ¶¶ 14-21, which is merely a form of relief and does not state a separate claim upon which relief may be granted.  Count II alleges a failure to pay wages and seeks relief pursuant to 26 M.R.S.A. § 626-A.  *Id*. ¶¶ 22-27.  The relevant statutes, as identified by the plaintiffs, Plaintiffs' Motion at 9, provide, in pertinent part:

> At regular intervals not to exceed 16 days, every employer must pay all wages earned by each employee.
>
> * * *
>
> An employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid . . . .
>
> * * *
>
> For purposes of this subchapter, a reasonable time means the earlier of either the next day on which employees would regularly be paid or a day not more than 2 weeks after the day on which the demand is made.
>
> * * *
>
> Any employer is liable to the employee or employees for the amount of unpaid wages and health benefits.  Upon a judgment being rendered in favor of any employee or employees, in any action brought to recover unpaid wages or health benefits under this subchapter, such judgment includes, in addition to the unpaid wages or health benefits adjudged to be due, a

---

oral agreement.  Exhs. C & D to Defendant's SMF.

> reasonable rate of interest, costs of suit including a reasonable attorney's fee,
> and an additional amount equal to twice the amount of unpaid wages as
> liquidated damages.

26 M.R.S.A. §§ 621-A, 626 & 626-A.  The defendant contends that no wages were earned by the

plaintiffs within the meaning of these statutes because the union members approved the 2000 collective

bargaining agreement, which included a 4 % reduction in wages to finance the proposed ESOP.

Defendant's Motion at 21.  The plaintiffs contend that "[i]t is undisputed that AFL has failed to pay the

plaintiffs back their wages that they contributed towards the ESOP and that they otherwise would have

received as earned pay but for Atkinson's promise to sell them a majority interest in the company."

Plaintiffs' Motion at 9.  They admit that three of the four plaintiffs "voted to contribute the amount of

4% of their weekly pay to participate in the ESOP buyout."  *Id*. at 11. They contend that the fourth

plaintiff, Lehouillier, has a "verbal and implied" claim under the cited statutes because "[h]is 4% pay

was probably counted with the ESOP escrow money as well."  *Id*. at 11-12.

     The plaintiffs appear to contend that the 4% reduction to fund the ESOP to which the union and

its voting members agreed was fraudulent because refusing to repay them their contributions once it

became clear that the ESOP would not be instituted converted their funds to "savings" given to the

defendant.  *Id*. at 11.  They cite *Fletcher v. Hanington Bros., Inc.*, 647 A.2d 800 (Me. 1994), for the

proposition that "[w]hen pay is earmarked in an employment agreement to pay for a benefit program,

that money is pay," *id*.  In that case, the Maine Law Court held that optional deductions from an

employee's pay for the purchase of health insurance must be included in the calculation of the

employee's "average weekly wage" for purposes of a since-repealed statute, the current version of

which is found at 39-A M.R.S.A. § 102(4).  647 A.2d at 800.  That statute concerns the definition of

the term "average weekly wage" for purposes of the Maine workers' compensation program. The Law

Court's construction of that term for that purpose has no apparent value for the consideration of the issue presently before this court. The plaintiffs take nothing by this argument.

The plaintiffs' essential argument is that the defendant's failure to refund their 4% when they left their employment with the defendant violates the cited statutes. Plaintiffs' Motion at 12. There is no dispute that the 4% reduction was approved by the union. Defendant's SMF ¶¶ 34-42; Plaintiffs' Responsive SMF ¶¶ 34-42. Accordingly, the plaintiffs have no claim under 26 M.R.S.A. § 621-A, because, from all that appears, all wages that were due to them during the period of their employment were promptly paid. The applicability of the remaining two statutes cannot be determined in the absence of a decision concerning the alleged inclusion in the "reopener agreement" of a term specifically addressing repayment of the 4% contributions toward the ESOP. If such a term was agreed upon by the union and the defendant, and if the plaintiffs' claims are not preempted by federal law, then the plaintiffs might have a claim under 26 M.R.S.A. § 626. For the reasons already discussed, that issue cannot be decided on this summary judgment record.

Count III of the complaint alleges that the defendant wrongfully converted the plaintiffs' wages by failing to return to them the 4% withheld as payment into the ESOP. Complaint ¶¶ 28-31. In fairly cursory fashion, the defendant contends that the plaintiffs "had no property interest in funds held in the Company ESOP Account" and that the funds "did not constitute 'wages' owed to the Plaintiffs, but rather were savings that AFL had accumulated as a result of union wage concessions." Defendant's Motion at 21. Given the way these funds were routinely characterized by the defendant, *e.g.*, Plaintiffs' SMF ¶ 40, Defendant's Responsive SMF ¶ 40 (defendant "sometimes" referred to bank account in which 4% of employees' wages were deposited as the "ESOP Escrow Account"); *id*. ¶ 41 (defendant referred to itself as "an employee-owned company" after September 2000); *id*. ¶ 43 (bank account was titled "Atkinson Freight Lines Corp. of PA ESOP Account"); *id*. ¶ 44 (employees were

told in writing that the "4% wage adjustment" was being put aside in escrow for employees to purchase the company); *id*. ¶ 45 (CEO stated in letter to all employees dated 3/26/01 "AFL employees have accumulated Two Hundred Thousand Dollars in a dedicated escrow account that is growing by an average of Twenty Eight Thousand Dollars per month" and "'you' are saving for a very large deposit to purchase the company"); *id*. ¶ 46 (account consistently referred to in company communications as "escrowed" money created by "wage adjustments" or "wage concessions"); *id*. ¶ 53 (CEO in 5/31/02 letter referred to "funds that have been held in escrow for the 'founding employees' since August 2000"); *id*. ¶ 59 (CEO in 3/10/03 letter to union representative stated plan to "return all ESOP held in escrow"); *id*. ¶ 62 (CEO in 6/18/03 letter to union agents stated "offer" to "return all monies held"); *id*. ¶ 69 (defendant sent list of drivers and their "ESOP Accrual" to union representative before 6/29/03 meeting), I find it extremely difficult to characterize the funds, as a matter of law, as the defendant's "savings" rather than contributions of wages otherwise earned by its employees. The defendant understandably cites no authority in support of its position. Its second argument is that the plaintiffs had no right to possess the funds in the ESOP account "at the time they were allegedly converted," Defendant's Motion at 21-22, because the distribution of those funds was done in accordance with the terms of the reopener agreement. Clearly, as to the second argument, disputed questions of material fact remain.

The plaintiffs contend, in similar fashion, that they were always "entitled" to the 4% of their wages that went into ESOP account, that the defendant was "aware that this money was being held for the employees . . . and in trust for one use only, 'investment' into the ESOP to buy shares of" the defendant and that the defendant wrongfully refused their demand for its return. Plaintiffs' Motion at 13-14. Again, this argument only prevails if there was no term in the reopener agreement applicable to the return of the 4%, a matter which is very much in dispute.

Count IV of the complaint alleges that the defendant breached its fiduciary duty to the plaintiffs "to deal honestly and in good faith with Plaintiffs" with respect to the 4% of wages held in the separate bank account. Complaint ¶¶ 32-35. The defendant contends that "no 'wages' of Plaintiffs were ever 'diverted'" into the ESOP account and that the funds in that account belonged to the defendant, so that the defendant could not have served as a fiduciary for those funds. Defendants' Motion at 22. Under Maine law,

> the salient elements of a fiduciary relationship [are]: (1) the actual placing of trust or confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue.

*Stewart v. Machias Sav. Bank*, 762 A.2d 44, 46 (Me. 2000) (citation and internal quotation marks omitted). Of course, abuse of the trust must also be shown. This definition does not appear to require resolution of the question of "ownership" of the funds in the bank account in question, contrary to the defendant's argument.

The plaintiffs do not address the second element; they do not suggest what evidence demonstrates "a great disparity of position and influence" between themselves and the defendant with respect to the funds at issue. Plaintiffs' Motion at 14-15. If such a disparity did not exist between Stewart, an individual with an associate's degree in paralegal studies, a field in which she had not obtained employment, and the bank, *Stewart*, 762 A.2d at 45, 46-47, it is unlikely that one can be established on the evidence in the summary judgment record in this case, where the plaintiffs were represented by a union or by members of a Buy-Out Steering Committee, Plaintiffs' SMF ¶¶ 24-25, 27; Defendant's Responsive SMF ¶¶ 24-25, 27. It is perhaps for this reason that the plaintiffs in their response to the defendant's motion for summary judgment for the first time refer to the defendant as the trustee of a trust of which the plaintiffs were presumably the beneficiaries. Plaintiffs' Opposition at 16-18. They do not explain how or why the defendant should be considered to have been "de facto trustee over the Plaintiffs' money,'" *id*. at 17, such that a different body of law, relating to trusteeship,

may be applied.  In the absence of this critical information, this court, as is its consistent practice, will not consider the undeveloped issue.  The defendant is entitled to summary judgment on Count IV, on the showing made.

## IV.  Conclusion

For the foregoing reasons, I recommend that the cross-motions for summary judgment be **DENIED** with respect to the question whether the plaintiffs' claims are preempted by section 301 of the Labor-Management Relations Act because disputed issues of material fact remain regarding that issue.  I further recommend that the plaintiffs' motion for summary judgment be **DENIED** and that the defendant's motion for summary judgment be **GRANTED** as to any claim asserted in Count II of the complaint arising under 26 M.R.S.A. § 621-A and as to Count IV and otherwise **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 11th day of August, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge